**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>JOHN RAYMOND CERVINI,<br><br>Debtor. | Chapter 11, Subchapter V<br>Case No. 24-22264 (SAB) |
| THOMAS BERTUSSI AND LOUIS BERTUSSI, INDIVIDUALLY AND AS EXECUTOR OF THE ESTATE OF JOHN BERTUSSI,<br><br>Plaintiffs,<br><br>-against-<br><br>JOHN RAYMOND CERVINI,<br><br>Defendant. | Adv. No. 25-07004 (SAB) |

**MEMORANDUM OF DECISION AFTER TRIAL**

## I. INTRODUCTION

This adversary proceeding arises in the subchapter V chapter 11 case of John Raymond Cervini (the "Debtor"), Case No. 24-22264. Fundamentally, this matter is the latest round of an acrimonious business divorce between two families who had enjoyed a fruitful partnership in the contracting business. At least, until the relationship broke down, the proverbial "gloves" came off and litigation ensued. The plaintiffs here, Thomas Bertussi and Louis Bertussi, individually and as executor of the Estate of John Bertussi (together, Plaintiffs or the "Bertussis"), hold a New York state court judgment against the Debtor and his late father, Eugene Cervini. The state court entered that judgment after finding that the Debtor and his father breached fiduciary duties they owed as officers, directors, and shareholders of a construction company they co-owned with the Bertussis.

On March 6, 2025, Plaintiffs filed a three-count complaint against the Debtor. ECF No. 1 (the "Complaint"). The Complaint asks the Court to (i) declare the judgment debt nondischargeable under section 523(a)(4) of the Bankruptcy Code ("Count I"); (ii) deny the Debtor a discharge under section 727(a)(2)(A) and section 727(a)(2)(B) of the Bankruptcy Code ("Count II"); and (iii) deny the Debtor a discharge under section 727(a)(4)(A) of the Bankruptcy Code ("Count III"). *Id.*

The Court held a three-day trial from August 4, 2026, through August 6, 2026 (ECF Nos. 45, 46, 47, the "Trial").[1] The Debtor; his accountant, David O'Brien; and Thomas Bertussi testified. Having considered the testimony, the exhibits admitted into evidence, the parties' post-trial submissions, and the record as a whole, the Court makes the following findings of fact and conclusions of law under Federal Rule of Civil Procedure 52, made applicable here by Federal Rule of Bankruptcy Procedure 7052. For the reasons below, the Court concludes that the judgment debt is nondischargeable under section 523(a)(4) and enters judgment for Plaintiffs on Count I. Counts II and III are dismissed without prejudice because section 727 does not govern the Debtor's discharge in this subchapter V chapter 11 case.

## II. BACKGROUND

Plaintiffs are brothers who, with their late brother John Bertussi, owned a construction company their father founded in 1958 as a plumbing, heating, and electrical business. Day 3 Tr. 41:17-25. The brothers later expanded the company into general contracting. *Id.* A "general" contractor is the firm that contracts directly with a project's owner and oversees the work, typically by hiring and coordinating specialty subcontractors. *See* Day 2 Tr. 8:8–9:7. By 2015, Bertussi

[1] Citations to the trial record take the following forms. The transcript of each trial day is cited by day, page, and line: ECF No. 46, Trial Tr. (Aug. 4, 2026), hereinafter "Day 1 Tr."; ECF No. 47, Trial Tr. (Aug. 5, 2026), hereinafter "Day 2 Tr."; ECF No. 45, Trial Tr. (Aug. 6, 2026), hereinafter "Day 3 Tr." The stipulated facts in the Joint Pretrial Order (ECF No. 42) are cited as "PTO ¶ __." Plaintiffs' exhibits are cited as "PX __" and Defendant's exhibits as "DX __." The Court cites only exhibits admitted into evidence.

Contracting, Inc. d/b/a Bertussi's ("Bertussi Contracting") had more than twenty-five years of experience on school and public general construction, HVAC, and plumbing projects. PTO ¶ 4.

The Debtor formed Grace Contracting & Development LLC ("Grace") in May 2010, about five years after he graduated from high school. Day 1 Tr. 11:10–20. At all relevant times, the Debtor was Grace's sole owner and managing member. PTO ¶ 1. By 2015, Grace was a general contractor working on a variety of school, public, and other projects. PTO ¶ 5. The Debtor testified that, between 2010 and 2015, Grace served as the prime contractor on roughly 25 to 30 projects. Day 2 Tr. 115:7–17. A "prime" contractor is one that contracts directly with the project owner, as opposed to a subcontractor that is hired by another contractor. *See* Day 2 Tr. 8:8–9:7. The Debtor's father, Eugene Cervini ("Eugene," and together with the Debtor, the "Cervinis"), worked for Grace until he died in September 2025. PTO ¶ 2. At Grace, Eugene served as its chief estimator, preparing bids with the Debtor and others. Day 1 Tr. 14:24–15:8.

The events giving rise to the dispute before this Court began almost a decade ago. In 2015, the two companies crossed paths, with Bertussi Contracting serving as the general contractor on a number of projects where Grace was engaged as a subcontractor. PTO ¶¶ 6-7; Day 1 Tr. 90:11– 17, 91:12–16. In early 2016, the Bertussis and the Cervinis sought to formalize their business relationship to work on public works construction projects together. PTO ¶ 8.

Accordingly, later that year, the Bertussis and the Cervinis formed a closely held corporation called B&G Contracting Ltd. ("B&G").[2] *Id.* ¶ 9. B&G had five shareholders: Thomas Bertussi, Louis Bertussi, John Bertussi, the Debtor, and Eugene Cervini, each entitled to 20% of

[2] Defendant disputed the formation date at trial, contending that the corporation was first formed in June 2016 under a different name. *See* Day 3 Tr. 73:5–79:7, 158:12–159:14; DX H. It appears the date makes no difference to any issue the Court must decide.

the shares of B&G (the "B&G Shareholders").[3] *Id.* ¶ 12; Day 3 Tr. 44:8–13. The shareholders never signed a written shareholders' agreement. PTO ¶ 11. Thomas Bertussi served as the President of B&G, the Debtor as vice president of B&G, and Eugene Cervini as an officer from B&G's formation until April 12, 2018 (collectively, the "Officers"). PTO ¶¶ 13–14; Day 2 Tr. 20:18–25; Day 3 Tr. 51:23–25.

The parties divided responsibilities as follows: Bertussis Contracting provided capital, managed B&G's finances, and handled bids, contracts, insurance, bonding, and warranties (it did so because B&G had no bonding capacity of its own, and Bertussis Contracting's bonding capacity was larger than Grace's); and Grace prepared bid estimates and acted as a subcontractor on B&G's projects. PTO ¶ 17-18. The Debtor managed B&G's field operations, overseeing the workers and the projects already underway. Day 1 Tr. 39:17–40:10. The Debtor testified that he never had access to B&G's accounting records or bank accounts. Day 2 Tr. 18:25–19:1, 39:23–40:6.

The Cervinis came to the venture with more than $550,000 of debt, including $23,500 in tax debt and hundreds of thousands of dollars of personal debt, and sought to have Plaintiffs loan them money in order to pay it off. PX 1; Day 1 Tr. 29:21–30:10; PX 56; Day 3 Tr. 45:10–16, 46:11–47:9. At a meeting on or about December 6, 2016, Thomas Bertussi explained to the Cervinis that such a loan would not be possible and that he would prefer that the Cervinis use the eventual B&G profits to pay off their debt. Day 1 Tr. 38:24–39:4; Day 3 Tr. 46:11–47:7.

In January of 2017, B&G officially began operating and working on the following projects: (i) Dobbs Ferry GC; (ii) Yonkers Saunders Auto Wing GC; (iii) Clarkstown Boiler GC; (iv) Middletown Phase 2 GC; (v) Clarkstown Auditorium GC; (vi) Yonkers Office Fire GC;

---

[3] The Debtor testified that he understood the parties had agreed to split profits equally between the two families. Day 2 Tr. 16:11-20. Thomas Bertussi denied any such agreement. Day 3 Tr. 44:14-20. The state court resolved this dispute, finding that profits were to be shared according to the parties' ownership interests. *See* Day 2 Tr. 115:21-116:5

(vii) Yonkers Vive 10 GC; and (viii) East Ramapo School District GC.[4] PTO ¶ 16. At the outset, business was going well, B&G reported a net profit of $501,830 for 2017, and the parties had high hopes for the future. PX 17; Day 3 Tr. 71:21–25.

By the fall of 2017, the relationship between the two families had begun to deteriorate. Day 1 Tr. 40:11–14; Day 3 Tr. 47:15–24. The Debtor testified that he came to believe the Cervinis were being treated unfairly, in part because they were not receiving half of B&G's profits. Day 1 Tr. 53:1–54:1. He also testified that his requests for access to B&G's books went unanswered. Day 2 Tr. 25:4–26:22, 39:23–40:6. Thomas Bertussi, for his part, testified that he was receiving complaints about the Debtor's inexperience in running jobs. Day 3 Tr. 47:15–24.

On or around October 30, 2017, the Debtor prepared a "wish list" of equipment, supplies, and operational changes he wanted for B&G. PX 57; Day 1 Tr. 42:12–44:5. He testified that Thomas Bertussi had asked several senior staff members to prepare such lists. Day 2 Tr. 27:20– 28:5. Then, at a meeting in November 2017, the Debtor asked for more authority. Day 3 Tr. 49:2– 20. Thomas Bertussi told him he was not yet ready for it. *Id.* At a meeting in early December 2017, the Debtor again pressed for more authority, including the ability to sign for B&G and a new pickup truck (an item from Debtor's wish list). Day 3 Tr. 51:6–52:5. Thomas Bertussi reminded the Debtor that he, not the debtor, was the president of the company, *id.*, to which the Debtor responded that there was not room for "two kings in the castle." Day 1 Tr. 55:25–57:20.

On December 4, 2017, Sheila O'Sullivan, then a Bertussi Contracting employee working in the B&G offices, emailed the Debtor a copy of Bertussi Contracting's vendor and contact list. PX 66; Day 1 Tr. 46:6–22; Day 3 Tr. 50:7–12. Thomas Bertussi was not copied on the email. Day 2 Tr. 117:19–20. The Debtor testified that the list was needed to open credit accounts for B&G

[4] "GC" stands for General Contractor and therefore denotes that B&G was serving as a general contractor on these projects.

with its existing vendors, one of the items on his wish list, and that Thomas Bertussi had told Ms. O'Sullivan to send it. Day 1 Tr. 50:2–51:5; Day 2 Tr. 29:16–31:23. Thomas Bertussi testified that he did not authorize the email and did not learn of it until the state court litigation had begun. Day 3 Tr. 50:13–51:5, 127:14–21.

At a meeting on December 19, 2017, Thomas Bertussi asked the Cervinis to sign non-compete agreements. Day 3 Tr. 53:12–55:3; Day 1 Tr. 54:2–5. The parties disagree about the terms proposed. The Debtor testified that he was asked to agree to a 20-year non-compete and his father to a five-year one, and that Thomas Bertussi also wanted the Cervinis to stop operating Grace and work exclusively for B&G. Day 1 Tr. 54:2–5; Day 2 Tr. 37:7–20. Thomas Bertussi testified that the discussion concerned non-competes lasting roughly two years. Day 3 Tr. 55:13–20. The Debtor refused to sign, stating the request suggested "enslavement," and told Thomas Bertussi that the request marked the downfall of their relationship. Day 1 Tr. 54:6–24, 55:6–10; Day 3 Tr. 54:17–25.

The Cervinis then left for the holidays, with the Debtor unsettled about what he was being asked to do and what he wanted to do next. Day 1 Tr. 58:17–23. When they returned in January 2018, he still had not decided whether to continue with the Bertussis. Day 1 Tr. 60:22–61:3. Even so, the Cervinis and a number of Grace employees moved onto B&G's payroll that month, and the Bertussis set up a 401(k) plan and other benefits for B&G's employees. Day 1 Tr. 60:11–21; Day 3 Tr. 56:8–22. Around the same time, the Debtor asked Thomas Bertussi when the Cervinis would receive the rest of the profit distributions they expected for 2017. Day 2 Tr. 38:11–21. Thomas Bertussi told him there would not be any distributions until the parties worked things out. *Id.*

On February 13, 2018, the Debtor requested a shareholder meeting to discuss the proposed dissolution of B&G. Day 1 Tr. 63:12–63:20; Day 3 Tr. 58:17–59:10. The Debtor brought a

document with him titled "B&G Proposed Dissolution," and told the Bertussis that the Cervinis wanted to stop working together beyond projects that had already been bid. Day 1 Tr. 63:21– 65:25; PX 2. The document was essentially a list of demands he would like to see realized prior to or upon dissolution. *Id.* The Debtor recognized that he left that meeting an officer and shareholder of B&G and that dissolution discussions were prospective and ongoing. Day 1 Tr. 69:21–70:1.

On March 12, 2018, Bertussi Contracting office manager, Donna Breit, emailed the Cervinis, with Thomas Bertussi and B&G's attorney, Frank Phillips, copied. PX 3. The email directed that no work for any company other than B&G be performed in the Bertussi Contracting or B&G offices or at Bertussi Contracting-bonded job sites, and it warned the Cervinis not to remove any property from job sites. *Id.*; Day 2 Tr. 49:21–51:3. On March 17, 2018, the Debtor responded:

> Tommy, please know we have no intention of leaving you in the lurch. All of the joint projects will be brought out and performed in an ordinary course, and we will coordinate with Donna what we are doing and what the anticipated time frame is for each . . . . We will not be working behind your back or removing anything belonging to B&G or necessary for B&G's business without your knowledge.

PX 3; Day 1 Tr. 72:21–73:2; 73:21–74:12.

The Debtor testified that he wanted Thomas Bertussi to believe those statements, and Thomas Bertussi testified that he did. Day 1 Tr. 73:5–20, 75:2–6; Day 3 Tr. 63:24–64:14. At Trial, the Debtor, who was a shareholder of B&G at the time he sent the email, explained that the second statement referred to B&G's equipment and tools. Day 1 Tr. 76:7–15 (shareholder reference); Day 2 Tr. 56:13–21 (tools statement).

The shareholders met again on March 26, 2018, to discuss dissolution. PTO ¶ 21. The Debtor was still an officer and shareholder of B&G and still running B&G's day-to-day field

operations. Day 1 Tr. 80:22–81:25. The next day, Mr. Phillips emailed the shareholders to schedule a formal meeting. Day 1 Tr. 82:1–83:6. He added that, until the issues concerning B&G's operations and assets were resolved, Thomas Bertussi had indicated that no further work should be performed on B&G's behalf and that the parties should not purport to represent B&G. PX 4; Day 1 Tr. 82:1–83:6. On March 29, 2018, Bertussis Contracting's counsel wrote to the Cervinis that, until all disputed issues concerning B&G were resolved in writing, they had no authority to conduct business on B&G's behalf, enter Bertussi Contracting properties or job sites, or remove property. PX 5; Day 2 Tr. 68:22–71:10. The Debtor testified that he complied with these directions. Day 2 Tr. 65:2–14, 69:6–15, 70:16–17, 71:2–10.

Also on March 29, 2018, Grace submitted a bid for the general construction contract on the Port Jervis Media Center project (the "Port Jervis Bid"). PTO ¶ 24; Day 1 Tr. 84:22–85:17. That project was a "multi-prime" job, meaning the owner awarded separate prime contracts for each trade contractor. Day 1 Tr. 85:22–86:8. Grace's bid was for the general construction contract, the same kind of work B&G performed. Day 1 Tr. 86:7–16. Grace won. Day 1 Tr. 85:1–6. When the bid was submitted, the Debtor was still a shareholder and officer of B&G, and Grace was still working on at least one outstanding B&G project. Day 1 Tr. 88:15–21, 92:10–12. The Debtor did not tell the Bertussis that Grace was bidding on the project. Day 1 Tr. 87:19–88:14.

The bid form asked Grace to list prior projects on which it had bid. PX 7. Grace listed seven: three were B&G projects and three were earlier joint projects, and Bertussi Contracting, not Grace, had submitted the bids on all six of those. Day 1 Tr. 89:1–91:16. The *only* project on the list that Grace itself had bid as prime contractor was the Roscoe Central School District project, completed in about 2015. Day 1 Tr. 91:17–22.

On April 12, 2018, the shareholders held a formal meeting, led by Mr. Phillips, at which they voted three to two to remove the Cervinis as officers. PTO ¶ 25; DX A at 1; Day 2 Tr. 79:10– 80:21, 123:17–22; Day 3 Tr. 69:8–15. The Debtor testified that he believed his removal as an officer ended all of his positions with B&G. Day 1 Tr. 98:9–99:18. In his 2020 deposition, however, he testified that, in his own eyes, he remained an officer after the April 12 meeting. Day 1 Tr. 95:24–97:1. The Cervinis remained shareholders. DX A; Day 1 Tr. 99:19–21; Day 2 Tr. 124:20–125:10. The shareholders agreed to finish the work already underway, including Grace's commitment to submit proposals by April 17 on the East Ramapo projects, but otherwise voted unanimously that B&G would cease doing further business. DX A; Day 2 Tr. 80:22–83:22; Day 3 Tr. 143:17–144:23. The minutes reflect that B&G's last bid had been on the Garrison project, dated in early February 2018. DX A; DX C; Day 3 Tr. 152:1–156:23.

On April 19, 2018, Grace submitted a bid for the general construction contract on the Goshen IT project, and again won (the "Goshen IT Bid"). PTO ¶ 26; Day 1 Tr. 97:2–24. Grace began preparing the bid before the date of submission. Day 1 Tr. 98:3–5. Ms. O'Sullivan, by then working for Grace, witnessed the Debtor's signature on the bond supplied in connection with the bid on April 17, 2018. PX 8; Day 2 Tr. 118:15–119:21. The Debtor did not tell the Bertussis about this bid either. Day 1 Tr. 98:6–8. When it was submitted, the Debtor was still a B&G shareholder. Day 1 Tr. 99:19–21.

Shortly thereafter, on April 21, 2018, the B&G Shareholders agreed to stop working together. PTO ¶ 27; Day 3 Tr. 70:7–71:4. Employees formerly employed at Grace left the B&G payroll to return to Grace, as did Ms. O'Sullivan who had formerly been a Bertussi Contracting employee. Day 3 Tr. 71:5–10; Day 1 Tr. 48:23–49:12. Before B&G was formed, Grace reported $1,950,644 in net contract revenue and $70,657 in net profits. PX 68; Day 1 Tr. 161:7–15. After

B&G's dissolution, it reported more than $4.6 million in net contract revenue, with profits in excess of $300,000. PX 24; Day 1 Tr. 161:4–6. B&G, by contrast, went from a profit of $501,830 in 2017 to a loss of $331,943 in 2018. PX 17; PX 18; Day 3 Tr. 71:21–72:14.

On August 1, 2018, the Bertussis sued the Cervinis in the Supreme Court of the State of New York, Rockland County, *B&G Contracting Ltd., et al. v. Eugene Cervini, et al.*, Index No. 034697/2018, alleging, among other things, that the Cervinis breached their fiduciary duties as officers, directors and shareholders of B&G and usurped corporate opportunities. PTO ¶ 28. On the same day, the Bertussis filed a separate proceeding to dissolve B&G, *Matter of Application of Thomas Bertussi, et al. v. B&G Contracting, et al.*, Index No. 034717/2018. PTO, ¶ 29. The two cases were consolidated (the "State Court Action"). PTO ¶ 30. In September 2020, the state court granted dissolution, denied the parties' cross-motions for summary judgment on the fiduciary claims, and dismissed certain of the Cervinis' counterclaims and third-party claims. PX 9.

The state court held a bench trial between October 17, 2022, and February 6, 2023. PTO ¶ 31. On December 29, 2023, it issued a Decision and Order After Bench Trial (the "State Court Decision"), finding that the Cervinis had breached their fiduciary duties and usurped B&G's corporate opportunities. PX 10. It awarded the Bertussis $1,091,538.04 in damages, plus prejudgment interest. PTO ¶ 32; PX 10. On January 5, 2024, the state court entered a money judgment against the Cervinis for $1,620,943.00 (the "Judgment"). PTO ¶ 33; PX 11. On March 28, 2024, the Debtor filed a voluntary petition under subchapter V of chapter 11. PTO ¶ 34; PX 12. This adversary proceeding followed.

## III. JURISDICTION

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157(a) and (b)(1) and the *Amended Standing Order of Reference* (M-431), dated January 31,

2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) and (J), and the Court may enter a final judgment. Venue is proper under 28 U.S.C. § 1409(a).

## IV. <u>LEGAL STANDARD</u>

***Nondischargeability and the Burden of Proof***

To give a "fresh start to the honest but unfortunate debtor," a bankruptcy discharge releases a debtor from most debts arising before the bankruptcy filing. *In re Golden*, 671 B.R. 544, 591 (Bankr. E.D.N.Y. 2025) (quotation omitted). Some debts, however, survive bankruptcy. Relevant here, a creditor or other party in interest who believes a particular debt should survive may ask the Court to declare the debt nondischargeable under section 523(a) of the Bankruptcy Code. Because a finding of nondischargeability leaves the debtor responsible for that debt even after bankruptcy, "exceptions to discharge are to be narrowly construed and genuine doubts should be resolved in favor of the debtor." *Denton v. Hyman (In re Hyman)*, 502 F.3d 61, 66 (2d Cir. 2007). The party objecting to a debt's discharge bears the burden of proof. *Race Place of Danbury, Inc. v. Scheller (In re Scheller)*, 265 B.R. 39, 51 (Bankr. S.D.N.Y. 2001). To prevail, the moving party "must prove each element by a 'preponderance of the evidence.'" *Id*. (quoting *Grogan v. Garner*, 498 U.S. 279, 285 (1991)).

***Section 5234(a)(4) of the Bankruptcy Code***

Section 523(a)(4) provides that a discharge under "section 727, 1141, 1192, 1228(a), 1228(b), or 1328(b) [will not] discharge an individual debtor from any debt . . . for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." Plaintiffs rely only on defalcation.[5] Accordingly, under section 523(a)(4), they must establish (i) the Debtor was a fiduciary; (ii) the Debtor was acting in that fiduciary capacity when he engaged in the conduct

---

[5] Plaintiffs' contentions and the agreed statement of issues to be tried are framed solely in terms of defalcation. PTO § IV.A ¶ 1; *id.* § V ¶ 1. The Court therefore does not address fraud, embezzlement, or larceny.

giving rise to the debt; (iii) the conduct amounted to defalcation. *See In re Nofer*, 514 B.R. 346, 353 (Bankr. E.D.N.Y. 2014).

As to the first prong, "[t]he meaning of 'fiduciary capacity' under Federal laws is more restricted than under the more general common law or state definitions." *Sandak v. Dobrayel (In re Dobrayel)*, 287 B.R. 3, 14 (Bankr. S.D.N.Y. 2002). In the Second Circuit, a "fiduciary" is "generally limited to instances involving express or technical trusts." *In re Wong*, 291 B.R. 266, 278 (Bankr. S.D.N.Y. 2003); *see Andy Warhol Found. v. Hayes (In re Hayes)*, 183 F.3d 162, 167 (2d Cir.1999). "A technical trust is one imposed by statutory or common law and will exist where the statute (1) defines the trust *res*, (2) identifies the trustee' fiduciary duties, and (3) imposes a trust prior to and without reference to the wrong that created the debt." *In re Parra*, 412 B.R. 99, 104 (Bankr. E.D.N.Y. 2009). The Second Circuit has made clear that some relationships that do not qualify as express or technical trusts may nonetheless fall within the section 523(a)(4) exception. *See In re Hayes*, 183 F.3d at 167. Those relationships are "characterized by 'a difference in knowledge or power between the fiduciary and principal which gives the former a position of ascendancy over the latter,' and [apply] where the fiduciary nature of the relationship has been well-established under state law." *In re Tashlitsky*, 492 B.R. 640, 645 (Bankr. E.D.N.Y. 2013) (quoting *In re Hayes*, 183 F.3d at 167).

The fiduciary duties of corporate officers, directors, and shareholders of closely held corporations are well established under New York law. "'[A] shareholder of a closely held corporation owes fiduciary duties to his fellow shareholders, in addition to those fiduciary obligations that arise out of his role as an officer or director of the corporation.'" *In re Liu*, 658 B.R. 231, 241 (Bankr. E.D.N.Y. 2024) (quoting *In re Nofer*, 514 B.R. at 354). Accordingly, the requisite fiduciary relationship needed for a meritorious section 523(a)(4) claim may stem from

the duty owed by a corporate officer or director to shareholders or the corporation itself. *In re Nofer*, 514 B.R. at 354; *see In re Hayes*, 183 F.3d at 168 ("[N]umerous cases have applied the defalcation exception to debts owed by corporate officers, notwithstanding the absence of any express trust.").

Once it is established that the debtor is a fiduciary, in order to succeed in a claim that a debtor should be denied a discharge, the plaintiff must show that the conduct giving rise to the claim of nondischargeability occurred while the defendant was acting within that fiduciary capacity and that the conduct itself constituted "defalcation." *In re Placeres*, 561 B.R. 354, 362 (Bankr. S.D.N.Y. 2016). The Supreme Court defined "defalcation" under section 523(a)(4) to include a culpable state of mind that involves "knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior." *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 269 (2013). Thus, if "actual knowledge of wrongdoing is lacking," then the fiduciary must have "consciously disregard[ed]" or been "willfully blind to" a "substantial and unjustifiable risk" that the conduct would violate a fiduciary duty. *Id.* at 274. "Mere negligence, without some element of intentional wrongdoing, breach of fiduciary duty or other identifiable misconduct, does not constitute a 'defalcation' within the meaning of section 523(a)(4)." *In re Scheller*, 265 B.R. 39, 53 (Bankr. S.D.N.Y. 2001) (quoting *In re Ellenbogen*, 218 B.R. 709, 716 (Bankr. S.D.N.Y. 1998)).

***Collateral Estoppel***

The doctrine of collateral estoppel applies in adversary proceedings that seek to except a debt from discharge and therefore a prior state court judgment can narrow the issues in a dischargeability proceeding. *In re Acker*, 663 B.R. 432, 439-40 (Bankr. S.D.N.Y. 2024). Relevant here, federal courts must give state court judgments "the same preclusive effect as would be given

that judgment under the law of the state in which the judgment was rendered." *DDR Const. Servs., Inc. v. Siemens Indus., Inc.*, 770 F. Supp. 2d 627, 647 (S.D.N.Y. 2011) (quoting *Cloverleaf Realty of New York, Inc. v. Town of Wawayanda*, 572 F.3d 93, 95 (2d Cir. 2009)).

The underlying Judgment at issue in this matter held that the Cervinis breached their fiduciary duties when they usurped two corporate opportunities by submitting and accepting the Port Jervis Bid and the Goshen IT Bid. PX 10 at 7. Because that Judgment was entered in New York, New York law governs its preclusive effect. *See VDARE Found., Inc. v. James*, 162 F.4th 77, 83 (2d Cir. 2025). Under New York law, collateral estoppel bars a party from relitigating an issue when: "(1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was actually litigated and decided, (3) there was a full and fair opportunity to litigate in the prior proceeding, and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits." *Deutsche Bank Nat'l Tr. Co. v. Murray*, 176 A.D.3d 1172, 1174-75 (N.Y. App. Div. 2d Dep't 2019) (quoting *Conason v. Megan Holding, LLC*, 29 N.Y. 1, 17 (2015)).

## V. <u>DISCUSSION</u>

### ***Preclusive Effect of the State Court Decision***

The Court begins with what the State Court Action already decided. The state court found:

> [T]he solicitation and acceptance by the Cervinis of the Port Jervis Media Center Project and the Goshen IT Project constitute a breach of fiduciary duty and usurpation of corporate opportunities by the Cervinis. Specifically, the Court finds that Plaintiffs have proven by a preponderance of the evidence that the actions of the Cervinis prior to the parties' final meeting in April, in submitting and accepting the Port Jervis Media Center Job and the Goshen IT Project without first offering the opportunity to B&G, constituted a breach of their fiduciary duties to B&G and a usurpation of these two corporate opportunities.
> * * *Applying the lost profits methodology, the Court finds that the conduct of Defendants prior to April 21, 2018 (*inter alia*, preventing access to B&G's vendor list and project files and soliciting projects and employees) did breach their fiduciary

> obligations to B&G, and usurped B&G corporate opportunities and that, in addition to the disgorgement of the Port Jervis and Goshen IT project profits, such conduct warrants repayment to the Bertussis of all additional expenses unnecessarily incurred to complete or finalize the B&G projects after the Cervinis departed.

PX 10 at 7–9.

Thus, all four elements of collateral estoppel under New York law are satisfied as to these findings. *See Deutsche Bank Nat'l Tr. Co. v. Murray*, 176 A.D.3d 1172, 1175 (2d Dep't 2019). The issues are identical: whether the Debtor breached his fiduciary duties to B&G, and usurped B&G's corporate opportunities, by submitting and accepting the Port Jervis Bid and the Goshen IT Bid without first offering those opportunities to B&G. Those issues were actually litigated in a bench trial that ran from October 2022 to February 2023, and they were decided. PTO ¶ 31; PX 10 at 7– 8. The Debtor, represented by counsel, had a full and fair opportunity to litigate them and does not contend otherwise. The findings were necessary to the Judgment, which mandates disgorgement of the profits from the two projects and on expenses the state court attributed to the Cervinis' breach. PX 10; PX 11. Indeed, counsel for the Debtor acknowledged at trial that the Debtor is not seeking to relitigate the State Court Decision. Day 3 Tr. 163:9–11.[6]

However, collateral estoppel does not preclude this Court from deciding (i) whether the Debtor was a fiduciary within the meaning of section 523(a)(4), and (ii) whether committed an act of defalcation in that capacity, both of which are questions of federal law. And because a breach of fiduciary duty under New York law does not necessarily involve the same level of culpable

[6] Accordingly, the Debtor may not relitigate whether his conduct breached his duties to B&G. The state court already rejected certain arguments raised in the Debtor's post-trial brief, including (i) that the fiduciary relationship ended before the Debtor submitted the Port Jervis Bid and the Goshen IT Bid vis-à-vis the Bertussis' March 29, 2018 letter (PX 10 at 7–8); and (ii) that Thomas Bertussi's own conduct should bar recovery. *See* Def.'s Post-Trial Mem. 15–18, 21. Moreover, this Court will not entertain the argument that the State Court's determination was based on a formalistic view of New York state law, thereby effectively relitigating the question the State Court already answered: the Cervinis breached their fiduciary duties, as those duties are understand in New York state law, in usurping corporate opportunities. *See id.*

conduct that defalcation does, this Court must decide whether any underlying breaches of fiduciary duty were committed with defalcation. *See Denton v. Hyman (In re Hyman)*, 502 F.3d 61, 69-70 (2d Cir. 2007) ("[S]ince misappropriation and breach of fiduciary duties apparently do not, under New York law, consistently require proof of a culpable mental state, . . . [the Second Circuit] . . . conclude[d] that collateral estoppel [would] not attach"). The Court decides those questions on the evidence presented at trial. Evidence that the Debtor offers to disprove the breach remains relevant to the extent it bears on his state of mind.

***Count I: Section 523(a)(4) of the Bankruptcy Code***

At all relevant times, the Debtor was a fiduciary within the meaning of section 523(a)(4). The Debtor was a vice president of B&G until April 12, 2018, when he was officially voted out as an officer. He was B&G's vice president from its formation until April 12, 2018. PTO ¶ 13. He was a shareholder of B&G, a closely held corporation, through at least April 21, 2018. PTO ¶¶ 9, 12, 27; DX A; Day 1 Tr. 99:19–21. The state court found that the Cervinis owed fiduciary duties to B&G as officers, directors, and shareholders. PX 10 at 7–8. Under New York law, "a shareholder of a closely held corporation owes fiduciary duties to fellow shareholders, in addition to those fiduciary obligations that arise out of his role as an officer or director of the corporation." *In re Liu*, 658 B.R. 231, 241 (Bankr. E.D.N.Y. 2024) (quoting *Mirarchi v. Nofer (In re Nofer)*, 514 B.R. 346, 354 (Bankr. E.D.N.Y. 2014)). Courts in this Circuit have held that those duties satisfy the federal standard. *See In re Nofer*, 514 B.R. at 353–54; *In re Liu*, 658 B.R. at 241 ("It is well-established that corporate officers and directors act in fiduciary capacities.").

The Debtor argues that he was not a fiduciary or acting in that capacity because (a) he was a minority owner with no ability to control B&G, (b) there was no shareholders' agreement, and (c) the Bertussis handled B&G's finances, bids, and bonds associated with bids. Def.'s Post-Trial

Mem. 12–13. He relies on decisions from the Seventh Circuit holding that the exception reaches only fiduciary relationships marked by "substantial inequality in power or knowledge" favoring the debtor. *See In re Woldman*, 92 F.3d 546, 547 (7th Cir. 1996). However, the Court is not persuaded by Debtor's conclusory assertion in this regard, for at least three reasons. ***First***, courts in this Circuit have found the fiduciary element was satisfied by the duties of corporate officers and shareholders of closely held corporations, without requiring that the debtor exercise full control or dominion over the company. *In re Hayes*, 183 F.3d at 168 (citing cases for the proposition that directors and officers are fiduciaries though recognizing that a dominant or controlling stockholder or group of stockholders may also qualify as a fiduciary); *see also In re Nofer*, 514 B.R. at 353–54. ***Second***, the duty at issue here does not depend on control. The duty of loyalty prohibits every officer, director, and shareholder of a closely held corporation from "us[ing] their position for their own personal advantage or for that of their confederates or to the detriment of stockholders." *In re Nofer*, 514 B.R. at 354–55. That obligation not to divert the corporation's opportunities runs alongside whatever affirmative duties a fiduciary is assigned. The fact that the Debtor did not prepare or submit bids for B&G did not free him to divert B&G's opportunities to his own company. ***Third***, the record does not support the premise that the Debtor lacked power or knowledge. To the contrary, he managed B&G's field operations. Day 1 Tr. 39:17–40:10. Grace prepared the bid estimates on B&G's projects. PTO ¶ 17. As one of five shareholders in a closely held construction corporation, the Debtor was in a position to know which public general construction projects were coming up for bid how to win them. *See* Day 1 Tr. 14:24–15:8. While the Debtor testified that he did not know he was a director of B&G, even if this statement is credited, it does not change his status as an officer and shareholder, and it does not change the duties that came with those roles. Day 2 Tr. 21:11–18. In sum, the factual findings

of the state court culminate, in the aggregate, to show that the Debtor was a fiduciary within the meaning of section 523(a)(4) of the Bankruptcy Code.

The Debtor acted in a fiduciary capacity at the time the "particular conduct giving rise to the liability which is claimed to be non-dischargeable" *In re Nofer*, 514 B.R. at 354. The "particular conduct giving rise to the liability" here is the Debtor's submission, through Grace, of the Port Jervis Bid on March 29, 2018, and the Goshen IT Bid on April 19, 2018. *Id.* The submission of the Port Jervis Bid and the Goshen IT Bid directly implicate his fiduciary role. The state court found that these two projects were B&G's opportunities. PX 10 at 7–8. Each was a public general construction contract of the kind B&G performed. Day 1 Tr. 86:7–16, 97:21–24. In the Port Jervis Bid, specifically, Grace presented B&G's and Bertussi Contracting's projects as its own experience. PX 7 ¶ 15; Day 1 Tr. 89:1–91:16.

The Debtor argues that he was not acting in a fiduciary capacity because, by late March 2018, the Bertussis and their counsel had barred him from acting for B&G, and he complied. Def.'s Post-Trial Mem. 17–18; *see* PX 4; PX 5. Those communications limited the Debtor's authority to act on B&G's behalf—but they did ***not*** release him from his duty of loyalty; indeed, the state court found that the relationship had not ended. PX 10 at 7–8. The Goshen IT Bid came after the Debtor was removed as an officer on April 12, 2018, but while he remained a shareholder. DX A; Day 1 Tr. 99:19–21. The Debtor testified that he believed his removal as an officer ended all of his positions with B&G. Day 1 Tr. 98:9–99:17. But the state court already rejected that argument. The submission of the Port Jervis Bid and the Goshen IT Bid occurred prior to the termination of the Debtor's role as a fiduciary.

The remaining question is whether the Debtor acted with the culpable state of mind required for defalcation: "knowledge of, or gross recklessness in respect to, the improper nature of

the relevant fiduciary behavior." *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 269 (2013). Absent actual knowledge, the Debtor must have "consciously disregard[ed]" or been "willfully blind to" a "substantial and unjustifiable risk" that his conduct would violate a fiduciary duty. *Id.* at 273-74. Plaintiffs have carried their burden on culpability. The Court finds that the Debtor was a fiduciary to B&G as that relationship is understood in the federal context until at least April 21, 2018. The Debtor was acting in that capacity when he submitted both the Port Jervis Bid and the Goshen IT Bid.[7] He knew that B&G's business had not ended, as B&G was still conducting shareholder meeting to negotiate the terms of a separation. PTO ¶¶ 20–21, 25. The Debtor's own dissolution proposal contemplated that jobs already awarded to B&G be completed together. PX 2; Day 2 Tr. 44:20–24. And two weeks before the Port Jervis Bid, Bertussi Contracting's office told the Debtor in writing that no work for any company other than B&G was to be performed in the B&G offices or at Bertussi-bonded job sites. PX 3.

Grace nevertheless submitted the Port Jervis Bid, and the Debtor did not tell the Bertussis. Day 1 Tr. 87:19–88:14. Three weeks after that, he did the same with the Goshen IT Bid, after his signature on its bid bond was witnessed by a former Bertussi Contracting employee who had come to work for Grace. Day 1 Tr. 98:6–8; Day 2 Tr. 118:15–119:21. Grace listed six projects that Bertussi Contracting, not Grace, had bid, three of them B&G Projects, when asked to list the projects on which it had previously bid. PX 7; Day 1 Tr. 89:1–91:16. The Debtor acknowledged that those bids "were submitted by the Bertussis." Day 1 Tr. 90:16–17. Moreover, the Port Jervis Bid and the Goshen IT Bid were submitted following months of friction over the Debtor's role and his compensation.

[7] The Debtor acknowledged that he was a shareholder and officer when Grace submitted the Port Jervis bid, Day 1 Tr. 88:15–21, and that he still held an interest in B&G after April 12. Day 1 Tr. 99:19–21. In his 2020 deposition, the Debtor testified that, in his own eyes, he remained an officer even after April 12. Day 1 Tr. 95:24–97:1.

Importantly, the Debtor did not ask the Bertussis whether submission of either the Port Jervis Bid or the Goshen IT Bid would present an issue, even as he represented B&G past projects as Grace's own. This directly contradicts his March 17, 2018 correspondence, which provided the Bertussis assurances that: "We will not be working behind your back or removing anything belonging to B&G, or necessary for B&G's business, without your knowledge." PX 3. The Debtor testified that he wanted Thomas Bertussi to believe that assurance (Day 1 Tr. 73:5–20, 75:2–6), and Thomas Bertussi did (Day 3 Tr. 63:24–64:14). On balance, the evidence presented at trial demonstrated that the Debtor acted, at least, with a conscious disregard to the substantial likelihood that his conduct would violate his fiduciary duty.

The Debtor argues that he could not have believed he was taking anything from B&G, because B&G had not bid on new work since early 2018 and the shareholders had voted on April 12, 2018 to cease further business. Def.'s Post-Trial Mem. 16, 22–23, 30–32; DX A; DX C. However, the state court found that both projects ***were*** B&G's opportunities, and this conclusion is entitled to deference. PX 10. Moreover, the Port Jervis Bid ***preceded*** the April 12, 2018 vote. If the Debtor believed B&G's decision not to pursue further business opportunities made all opportunities fair game, he could have simply asked.

Nevertheless, the Debtor emphasizes that neither the Bertussis nor their counsel or B&G counsel told him Grace could not bid on new projects, and he testified that no one told him he could not do work on behalf of Grace. Day 2 Tr. 65:13–14; *see* PX 4; PX 5.[8] But a fiduciary's

[8] The Debtor testified that Thomas Bertussi congratulated him on the Port Jervis award at the April 12 meeting. Day 2 Tr. 73:2–9, 74:21–25. Thomas Bertussi did not recall doing so but acknowledged that he may have learned of Grace's award before that meeting. Day 3 Tr. 69:22–70:4, 148:12–149:1. Even on the Debtor's telling, Thomas Bertussi learned of the Port Jervis bid only ***after*** it was submitted and won—and not from the Debtor but from public bidding information or his own firm's bid on the same project. Day 2 Tr. 75:13–76:23; Day 3 Tr. 146:17–149:1. What matters is the Debtor's state of mind when he acted; another fiduciary's discovery of a concealed act after the fact does not prove that the Debtor acted in good faith. And there is no evidence that the Bertussis knew of the Goshen IT Bid in advance. To the extent the Debtor argues that Thomas Bertussi's own conduct bars recovery, that argument goes to liability, which the state court decided.

duties apply even without such express instructions. *See Bullock*, 569 U.S. at 274 ("Where actual knowledge of wrongdoing is lacking, [the court] consider[s] conduct as equivalent if the fiduciary consciously disregards (or is willfully blind to) a substantial and unjustifiable risk that his conduct will turn out to violate a fiduciary duty.") (quotations omitted). The Court finds that Plaintiffs have proved by a preponderance of the evidence that the Debtor committed defalcation while acting in a fiduciary capacity in submitting the Port Jervis BID and the Goshen IT Bid. The debt arising from the Debtor's defalcation is nondischargeable in its entirety. *See Cohen v. de la Cruz*, 523 U.S. 213, 218–20 (1998); *see also Race Place of Danbury, Inc. v. Scheller (In re Scheller)*, 265 B.R. 39, 60 (Bankr. S.D.N.Y. 2001).

***Counts II and III: Section 727 of the Bankruptcy Code***

Counts II and III ask the Court to deny the Debtor a discharge under sections 727(a)(2) and 727(a)(4)(A). Because this case arises under subchapter V of chapter 11, Section 727 is inapplicable, as it applies only in chapter 7 cases. 11 U.S.C. § 103(b); *In re Rockmacher*, 117 B.R. 69, 69–70 (Bankr. S.D.N.Y. 1990), *aff'd*, 125 B.R. 380 (S.D.N.Y. 1991).[9] Under chapter 11 (including subchapter V), an individual debtor receives a discharge only when the Court confirms a plan. If the plan is consensual, the discharge is granted under section 1141(d). 11 U.S.C. §§ 1141(d). Where the plan is confirmed without the consent of all impaired classes, the discharge is granted under section 1192. *See* 11 U.S.C. §§ 1141(d), 1181(a), 1191, 1192. Section 523 remains relevant in a subchapter V case because both discharge provisions expressly

[9] Section 727(a) does apply to chapter 11 cases in limited circumstances not present here. Specifically, where the debtor is an individual and is seeking to confirm a consensual plan under section 1141(d), section 1141(d)(3) creates an exception to the otherwise broad discharge being granted. Section 1141(d)(3) provides that "the confirmation of a plan does not discharge a debtor if— (A) The plan provides for the liquidation of all or substantially all of the property of the estate; (B) the debtor does not engage in business after consummation of the plan; and (C) the debtor would be denied a discharge under section 727(a) of this title if the case were a case under chapter 7 of this title." A confirmation hearing on the Debtor's First Amended Plan has not yet been held and therefore any issues arising under Section 727 are premature.

exclude debts that are nondischargeable under section 523(a). *See* 11 U.S.C. §§ 1141(d)(2), 1192(2); *In re Rockmacher*, 117 B.R. 69, 69-70 (Bankr. S.D.N.Y. 1990), *aff'd*, 125 B.R. 380 (S.D.N.Y. 1991). Section 727 plays no comparable role. Accordingly, Plaintiffs' claims under section 727 are **DISMISSED** without prejudice to Plaintiffs' right to renew these claims in the form of objections to plan confirmation; or in the event of a conversion to chapter 7, objections to discharge in that capacity.

## VI. CONCLUSION

For the reasons stated above, the Court finds and concludes as follows:

On Count I, Plaintiffs have proved by a preponderance of the evidence that the Debtor committed defalcation while acting in a fiduciary capacity. The Debtor's debt to Plaintiffs arising from the Judgment entered in the State Court Action on January 5, 2024, in the amount of $1,620,943.00, together with any post-judgment interest accruing under applicable law, is **NONDISCHARGEABLE** under 11 U.S.C. § 523(a)(4).

Counts II and III are **DISMISSED** without prejudice because 11 U.S.C. § 727 does not govern the Debtor's discharge in this subchapter V chapter 11 case.

Plaintiffs are entitled to an order and judgment in this adversary proceeding declaring the state court Judgment nondischargeable. Counsel for Plaintiffs shall prepare an order consistent with this Decision and share it with Debtor's counsel for approval as to form and thereafter submit it to Chambers within fourteen (14) days of entry of this Decision.

Dated: October 28, 2026
New York, New York

/s/ *Shireen A. Barday*
**HONORABLE SHIREEN A. BARDAY**
**UNITED STATES BANKRUPTCY JUDGE**